## Lucille Mae TUTTLE v. Linda Sue PHILLIPS

5-5388                                    460 S. W. 2d 328

Opinion delivered December 14, 1970

*Paul Jameson,* for appellant

*Herbert L. Ray* and *Davis & Reed,* for appellee.

CARLETON HARRIS, Chief Justice. Henry Clay Thompson, a resident of Washington County, Arkansas, died intestate on June 5, 1967, seized and possessed of certain lands, approximately 54 acres, which are involved in this litigation. No administration was had on his estate, and he was not survived by a widow. A son, John L. Thompson, survived Henry, but there were no other children born in lawful wedlock. In November, 1968, John L. Thompson executed and delivered to Linda Sue Phillips, appellee herein, a warranty deed purporting to convey the aforementioned lands to her, the deed being subsequently recorded in Washington County. In this deed, John L. Thompson described himself as the "sole surviving heir of H. C. Thompson". A life estate was reserved but it was extinguished by the death of Thompson on December 9, 1968. Lucille Mae Tuttle, appellant herein, was born on May 1, 1922, in Washington County, her mother being Lula Gibbs. On October 10, 1924, some two and one-half years after the birth of appellant, Henry Clay Thompson and Lula Gibbs were married

in a lawful wedding ceremony in Washington County, though they had apparently already lived together for some period of time, along with the children, at least for a year and a half. Prior to that, Lula, and her children had lived in a Thompson rent house. During her childhood years and until the time of her marriage, appellant used the name of Lucille Mae Cook.

On July 9, 1965, Henry Clay Thompson executed an affidavit before J. E. Bunch, Notary Public, in which he acknowledged that Lucille Mae Tuttle was his daughter, and he recognized her as such. In January, 1969, Mrs. Tuttle instituted suit in the Washington Chancery Court alleging that she was the daughter and one of the two heirs at law surviving Henry Clay Thompson; that she was entitled to an undivided one-half interest in the real estate heretofore mentioned, appellant praying that the lands be ordered partitioned and that her interest be set aside to her. Her claim as a legitimate child of Henry Clay Thompson was based upon Ark. Stat. Ann. § 61-103.[1] The pertinent portion of that statute as follows:

"If a man have by a woman a child or children, and afterward shall intermarry with her, and shall recognize such children to be his, they shall be deemed and considered as legitimate."

After the filing of an answer by Linda Sue Phillips, denying the allegation of the complaint and alleging laches and estoppel,[2] the case proceeded to trial. After hearing a number of witnesses, the chancellor held that Mrs. Tuttle had not shown by a fair preponderance of the evidence that she was Henry Thompson's daughter, and consequently had failed to prove that she was an heir at law of the deceased. From the decree entered in accordance with these findings, appellant brings this appeal. For reversal, it is asserted that the finding and

[1]This statute was re-enacted in 1969 as a part of a more comprehensive statute, being Ark. Stat. Ann. § 61-141 (Supp. 1969).

[2]Though these defenses are alleged in the answer, they are not argued here, and apparently have been abandoned.

decree of the chancellor were clearly against the preponderance of the evidence, and it is asserted that the affidavit of William A. Thompson (a brother of Henry C. Thompson) offered by appellee was inadmissible.

Let us review the testimony on behalf of the litigants. Appellant testified that she was 48 years of age and lived in Bois D'Arc, Missouri. She said that she was born on May 1, 1922, and that her mother was Lula Gibbs. . .her mother was married to Henry Clay Thompson on October 10, 1924. . . she remembered when she lived in the house located in the White House community with her mother, Henry Thompson, and the two older children of her mother, Jack Cook and Lorene Cook. . . Thompson had one child at the time, John Thompson, who was about 20 years older than the witness. She attended school at White House under the name of Lucille Cook, but did not know why that name was used. She lived with her mother and Thompson until she was 16 years of age, at which time she married. The witness said at that time she always considered John Thompson a step-brother and that she had always had a good relationship with him. Mrs. Tuttle stated that after moving away from the family home, she kept in contact with John and Henry during their lifetimes and would visit as often as possible, even after her mother died in 1962. Appellant said that in 1965, Mrs. Lee Shelton called and told her that Mr. Henry Thompson had had a stroke and was in the hospital. Mrs. Tuttle made the trip to Arkansas the next morning. Thompson was in the hospital for almost a month and when he was able to leave, the witness took him to her home while he recuperated. Appellant testified that the night before she took Henry Thompson to her home, she received a phone call from John Thompson, who advised her that she was a daughter of Henry Thompson, and was actually his (John's) half-sister. John told her to get the birth certificate. This birth certificate reflected that the full name of the child was Lula Gibbs; that her mother was Lula Gibbs; and she was born on May 1, 1922. The certificate further reflects "putative father not given". The certificate had been filed

on June 16, 1922, and was signed by F. R. Morrow, the physician. Appellant showed this affidavit to Henry Thompson at the family home at White House and asked if he could identify his handwriting on part of the blanks. He looked at it with his glasses on while using a magnifying glass, and replied that it looked like it, but he could not identify it because "Its been too long". Henry then remarked to John Thompson, who was present, "Son, you've sure cut a gut this time". On inquiry by appellant as to what he meant, Henry replied " 'You weren't supposed to know anything about it, until I'm dead.' He said, 'I wanted your mother's name to rest in peace as long as I lived.' He said, 'That she had enough trouble in her lifetime and I want her name to rest in peace while I live.' Said, 'When I die, there will be papers left for you explaining everything.' "

According to the witness, Henry Thompson looked at the birth certificate again, noticed that the name of the child was the same as the maiden name of the mother, and commented "That's not right". He asked what name she used in school and upon her replying "Lucille Cook" began to cry, stating "Baby, I never knew that, I never knew that you used the name of Cook in school". Appellant said that Thompson did not want any papers drawn locally because he didn't "want anyone to know until I am dead", but at his suggestion, appellant went back to Missouri, had an attorney prepare an affidavit, subsequently returned, and presented the affidavit to Thompson at his home. The latter then called Mr. J. E. Bunch, a banker at Elkins, and made an appointment. Thompson was then taken to the bank where he executed the affidavit before Bunch, a notary public. The affidavit reads as follows:

## "AFFIDAVIT

STATE OF ARKANSAS         )
                            ) SS.
COUNTY OF WASHINGTON )

I, Henry Clay Thompson, of Fayetteville, Arkansas, being duly sworn, upon my oath state that Lucille

Mae Tuttle, wife of Hubert Tuttle, of Bois D'Arc, Missouri, was born on the first day of May, 1922, at Fayetteville, Arkansas; that her true name was Lucille Mae Thompson, but that through error her name was reported by the attending physician as Lula Gibbs, and Birth Certificate No. 2906 issued by the State of Arkansas gives her name as Lula Gibbs; I have seen a certified copy of said birth certificate, the certification bearing date of June 10, 1965; and that I have personal knowledge of the facts here stated, I having married the child's mother and she is my daughter."

Mrs. Tuttle said that Henry Thompson told her that he had her listed in his will as a step-daughter, but now that John had told her, he would have to change it. The last letter that she received from Henry Thompson, dated January 6, 1967, and entirely in his handwriting, was signed "By now, Dad".

Appellant testified that at the time of his death, Henry Thompson was staying at the home of the Kenneth Bradleys, and Bradley said that he was the administrator of Thompson's estate through verbal arrangement; that on the day of the funeral, Bradley told her that he would call her in about thirty days after everything was settled; that everything "was down in black and white and would be taken care of in accordance with Mr. Thompson's wishes". He subsequently called and told her that Thompson had left her $3,000.00 in bank certificates, and that he would send them to her. She stated however, that she wanted to visit there anyway and it would be a good time to read the will. Bradley then advised her that there was no will, "And he said there were no papers. And then I asked him what he meant by saying that everything was down in black and white; there was nothing for me to worry about. And at that time he said, 'there is a paper but I am reluctant to disclose the contents because of hurting someone's feelings.' And that is the last I heard of any papers at all."

Appellant said she took no further action to ascer-

tain the status of her father's estate because he had told her that the papers were fixed so that John could not do away with the property, but when she didn't hear from anyone after John's death, she asked an attorney to look into the matter.

Mrs. Tuttle testified that on the day she received the bank certificates from Bradley at the bank, she took a letter from her father telling her and her sister to go to the bank together, after his death, "and there we would find his papers." She said that she took the letter and the bank officer made a search for papers but could not find anything. The witness stated that Bradley told her that he (Bradley) was receiving $1,500.00 in bank certificates.

Six additional witnesses testified on behalf of appellant. Ellen Frost, a resident of Elkins, testified that prior to living in Elkins, she lived in the White House community and had known Lucille Tuttle since she was a "tiny baby"; she is not related to any of the parties. She had known all of the Thompsons, and knew Lula Gibbs, the mother of Lucille. According to the witness, Lula, with the two children by her marriage to Cook, Jack and Lorene Cook, together with appellant, was living in a rent house belonging to Henry Thompson, but later moved into his residence. She said that she visited in the Thompson home from time to time after he married Lula Gibbs; that she knew that Lucille was born prior to the marriage between Henry and Lucille, and that Lucille went by the name of Cook. According to the witness, in a conversation with the mother of Lucille in regard to the identity of Lucille's father, she was told that Lucille was the child of Henry. She said that she heard her own father say that Lucille was Henry Thompson's child. Martha Koprek, 71 years of age and an aunt of Lucille Tuttle, testified that her sister Lula had lived in a rent house belonging to Henry Thompson and that she met Thompson in that home. In fact, she stated that she would always find him there; that he had clothing there and she had seen her sister ironing his clothing. She

had thought they were married. She said that several weeks after Lucille was born, she was in the home, and Henry picked up appellant and said "Look at our baby".

Hubert Tuttle, husband of Lucille, testified that on the day before the funeral of Henry Thompson, his wife had a piece of paper (later shown to be an affidavit) which she showed to Will Thompson, brother of Henry, and grandfather of the appellee, asking Thompson "Would you know about this, Will?" and Thompson replied "I don't know about this piece of paper. I have always known you were Henry's daughter". According to the witness, Thompson said that he had heard John Thompson say several times that Lucille was his half sister. Maxine Gano, whose sister in law is the sister of appellant testified that she had lived in the White House community until she was about 22 years of age, and that she knew Henry Thompson for about forty years. She said the discussion in the community was that Lucille was Henry Thompson's child. Roy Gano, husband of Maxine, testified that he was present on the day before Henry Thompson's funeral when Lucille Tuttle showed Will Thompson the paper stating that Henry Thompson was her father, and Will Thompson stated that he had always known that.

J. E. Bunch, a banker and notary public at Elkins, unrelated to any of the parties, testified that he had known Henry Thompson since 1928, and that on July 9, 1965, he acknowledged an affidavit presented to him by Henry Clay Thompson. He said that Henry came to the bank and signed the affidavit, no one assisting him in writing his name. The witness stated that after the affidavit had been acknowledged, Henry Thompson took it with him, and he said that, judging from Henry Thompson's general appearance, he would consider Thompson in "fair health". Bunch also testified that he acknowledged an affidavit executed by Will Thompson, the brother of Henry, on July 12, 1967. This affidavit, which will be subsequently mentioned under

point two, *inter alia* stated that the sole and only heir at law of Henry Clay Thompson "to the best of my knowledge, information and belief, is John L. Thompson".

Wilma Bradley, her husband, Kenneth Bradley, Gladys Cole, E. W. Price, Ruby Robbins, Frank Skelton, and the appellee herself, Linda Sue Phillips, testified on behalf of appellee. Mrs. Bradley, a practical nurse, said that she furnished nursing care in her home to Henry Clay Thompson; that he came to her home in March 1967, and stayed there until his death, some three months later. She said that he was first in a rest home in 1966, and she would go there and visit him; that his mental faculties were perfect; that on an occasion, she was resting on her bed in another room and heard a conversation wherein Mrs. Tuttle made an offer for the purchase of the property here involved. She said that she did not hear all of the conversation but was able to hear portions because Mr. Thompson didn't hear too well and when talking with him, people had to talk loud. The witness stated that she provided board, room and nursing care to Thompson for $100.00 per month. Gladys Cole, 66 years of age, testified that she had known appellant since 1923 or 1924; that she didn't know when Lucille was born, not knowing her until "she was a good sized girl", but that she knew appellant's mother, who lived in a house belonging to Henry Thompson. She mentioned a particular time when she and her sister, together with her father and two children, had made a visit to Lula Gibbs and there was a discussion as to why the name of Cook had been given to appellant. Mrs. Cole said that Lula Gibbs stated that she didn't want all of her children's names to be different, and that Lucille "belongs to Sam Bohannon". The witness also said she had seen other men come and go from the house but she added that she was not implying misconduct on the part of Lula Gibbs. Mrs. Cole said that she was not related to appellee, but was a close friend.

E. W. Price testified that he had known Henry

Thompson and his brother, Will Thompson, and had been a good friend of Henry's; that he knew Lula Gibbs prior to the time she married Henry Thompson. He said that she had moved in with Henry and had three children, the youngest being the appellant. Price testified that Lula (Gibbs) Thompson told him that the father of the children was a man by the name of Ben Cook. The witness said that Henry Thompson referred to the children as "Lou's children". Price stated that when he first became acquainted with Lula Gibbs, she was not married (to his knowledge), and that she had two children when he first knew her; that the third child (appellant) was with her when she moved over into the neighborhood. When asked if he told Henry Thompson about Lula saying that the child belonged to Ben Cook, Price said "No, I didn't tell Mr. Thompson about it. He knew as much about it or more than anybody else, I guess".

Ruby Robbins testified that she knew a girl by the name of Lucille Cook during school days; that she had visited in the Henry Thompson home and that Lucille referred to Henry Thompson as "Mr. Thompson". Kenneth Bradley, husband of Wilma, testified that he helped Henry Thompson with his business affairs when Thompson would request him to look into matters. "Well, just to see about various things, maybe. I can't recall any particular thing but such as maybe getting clothing or an item of some kind, some medicine, or just minor things. Then he did take me into his confidence concerning his financing, and he did give me this bank account, and had my name put on the checking account; gave me full authority to handle that." He said that after Thompson's death, he (Bradley) delivered some certificates of deposit, two of which were delivered to Lucille Tuttle in the amounts of $1,000.00 and $2,000.00. The witness stated that Lucille told him she wanted the farm and that he replied that "That would be up to John". Frank Skelton, father of appellee, and son-in-law of Will Thompson, testified that he was at the Fayetteville hospital on an occasion when appellant visited Henry Thompson; that appellant told Henry

that she was going to make him a toddy, and did give Henry Thompson the toddy, though the latter stated that he didn't want it. He said that Henry remarked " 'I'd rather she wouldn't do that,' Said, 'Every time she does it, she gives me too much.' And said, 'She will go out there and get him [referring to John Thompson] in the same shape.' " When asked if he knew the general repute and reputation as to the father of Lucille Tuttle in the community, he replied "Lord only knows, I've heard things from here to there; everything is hearsay. But I've heard so many rumors that I can't remember any more, I don't guess. * * * Well, Cook, is the only thing I ever knowed her to go by. * * * Well, it's hearsay. I heard she was a Bohannon."

Sue Phillips testified that Henry Clay Thompson was her great-uncle and that she was associated with him during the last five years of his life; that during the last two years of his life, his physical condition was bad. She testfied that he had a stroke. She said that he didn't have the complete use of his right arm but she didn't know if he could write after the stroke; that he couldn't see to read when he was in the hospital but she didn't know if his ability to read improved after he left the hospital. She testified there was a magnifying glass lying on his table.

It will thus be observed that, with the exception of one witness, all the rest testified actually only to circumstances, which more or less, supported the position of the party on whose side they testified. A number of the witnesses might be termed to have, at least some possible interest in the case, since they were related to the parties. Probably the most pertinent part of the testimony dealt with the statements of the parties relative to what Lula Gibbs had said about the identity of the father of the child. Of course, the statement of Will Thompson, brother of Henry Thompson, that the sole heir at law of Henry C. Thompson, "to the best of my knowledge, information and belief is John L. Thompson", could not mean very much, even if the affidavit were admissible. We do not consider

the affidavit admissible for reasons hereafter set out under point two, but it might be added that even if we considered that evidence admissible, we think the preponderance of the testimony lies with appellant. This conclusion is based upon the affidavit of Henry Clay Thompson, wherein he acknowledged that the name of appellant should have been Lucille Mae Thompson, and that she was his daughter. The witness, J. E. Bunch, the Elkins banker, seems to have been a totally disinterested witness, nor is this fact questioned by appellee. This witness said that Mr. Thompson signed the affidavit, without aid, and this fact is not questioned. It seems likewise to have been established that when wearing his glasses, and using a magnifying glass, he was even able to read a newspaper. Several witnesses mentioned the magnifying glass. The testimony of Mr. Bunch, and the affidavit of Henry Thompson are, from the standpoint of evidence, far superior to any other evidence offered in the case. The trial court held that Mrs. Tuttle had not established by a clear preponderance of the evidence that she was the daughter of Henry Thompson. How does one establish such a fact? What proof could be offered that would be more significant, or more potent, than the statement from a purported father himself, recognizing one as his child? Not even a blood test establishes paternity; such a test can only establish that one could not be a parent. We know of no way that absolute paternity can be established, and it would appear that in the case before us, the strongest evidence possible (affidavit of Henry Thompson) has been offered.

A review of the cases on this subject reflects that the focal point in this type of case is whether a purported father recognized the child as his own. We find no Arkansas case in which such recognition was afforded through writing. The question was always whether the purported father had orally given such recognition. The Ohio case, *Eichorn* v. *Zedaker,* 144 N. E. 258, contains language which pretty well expresses our feelings in the litigation before us.

"It is urged by counsel for defendants in error that, even if it be admitted that there is evidence of J. F. Eichorn having acknowledged the paternity, there is no proof of the fact of the paternity itself. *Counsel have not, however, pointed out to the court what degree or what character of proof should be required to establish the paternity. In the very nature of things such a proposition is not capable of demonstration.* [Emphasis supplied] If the court should lay down a rule requiring resort to such technical niceties, it would be impossible to prove paternity in any case. Absolute proof could only be made by showing access of the alleged father and also proof of the impossibility of access of any other man. History only records one such illustration, viz, Cain and Abel. *If a man and woman should be placed under guard for a natural period of gestation, there would still be a possibility of some suspicion attaching to the guard. Or if a man and woman were placed upon some lonely island, we could not disprove the presence of some lurking savage.* [Our emphasis] It is against sound public policy to resort to such technicalities, and no valid reason is urged why an admission of this fact, if not otherwise disproved, should not be accepted as it would be in proof of any other fact."

As to the second point, we think the evidence of Will Thompson was clearly inadmissible. See *Southern Farm Bureau Casualty Ins. Company* v. *Anderson*, 220 Ark. 373, 247 S. W. 2d 966. The affidavit is probably also inadmissible for yet another reason, but there is no need to discuss point two since, as earlier stated, even considering the statement made by Will Thompson, we are still of the view that the evidence preponderates in favor of the appellant. This is mainly true because, after all, Will Thompson could not possibly know whether Henry was the father of Lucille Tuttle.

Perhaps the whole contention was best summed up in a statement made by E. W. Price, a witness on behalf of appellee who, when asked if he had told Henry

Thompson about Lula's statement that the child belonged to Ben Cook, replied "No, I didn't tell Mr. Thompson about it. He knew as much about it *or more*[3] than anybody else, I guess".

We agree.

In accordance with what has been said, the decree of the Washington Chancery Court is hereby reversed and set aside and the cause is remanded to that court with directions to enter a decree consistent with this opinion.

It is so ordered.

FOGLEMAN AND JONES, JJ., dissent.

J. FRED JONES, Justice, dissenting. I cannot agree with the majority opinion in this case. While we do try equity cases de novo, we do so on the record before us and unless the chancellor's decree is clearly against the preponderance of the evidence, we should affirm the decree.

It is my view that if there ever was a case in which the chancellor's observation of the witnesses and their demeanor while testifying is worth anything to a just and proper decree, this is such case. Here the appellant, Lucille Mae Tuttle, after more than 40 years, and after the death of Henry Clay Thompson, as well as after the death of his only child born in lawful wedlock, sets out to prove that she is the child of Henry Clay Thompson who married her mother when the appellant was two and one-half years of age. The primary object of the effort is the undivided one-half interest in an 80 acre tract of land sold by John Thompson after the death of his father, Henry Clay Thompson.

The chancellor went to unusual lengths and did a commendable job in trying this case and the transcript reveals a keen perception on the part of the chancellor

---

[3]Emphasis supplied.

of the problem involved. The chancellor has favored this court with a detailed and well-reasoned finding of facts upon which he based his decree, and I agree with the chancellor.

The majority seem to lay great stress upon an affidavit signed by Henry Clay Thompson at a time when he used an extra magnifying glass with which to read a birth certificate filled out in a bold and legible hand; and after he had suffered a stroke and would cry when advised, apparently for the first time, that the appellant had used the name "Cook" all through her school years while she lived in the home with him. It is obvious that the language of the affidavit is not the language of Henry Clay Thompson but, as for that matter, the appellant does not contend that it is. The appellant had the affidavit prepared in Missouri after Henry Thompson had a stroke, and after she says she was told by John Thompson that she was his half sister. The appellant says that the reason she had the affidavit prepared by an attorney in Missouri, was that Mr. Thompson did not want anyone locally to know the facts until after his death. Nevertheless, she went with Mr. Thompson to the nearest notary public in Arkansas where the affidavit was signed. Aside from the affidavit and the appellant's own testimony of what others had told her, the remaining testimony is hearsay and can be considered no more than evenly balanced and none of it lends a great deal of credence to the appellant's own testimony.

I reluctantly agree with the chancellor that there was evidence that Thompson did *recognize* the appellant as his child, but he only did so after more than 40 years and did so then very reluctantly as indicated by the remark the appellant says he made to his son John, upon being advised that the appellant had finally learned of their relationship.

To me the appellant's testimony is incredible as to what happened when she showed her birth certificate to Henry Thompson. She says that he asked her, ap-

parently for the first time in 40 years, what name she went by in school, and when she told him "Lucille Cook," he began to cry and said he never did know that. It is rather strange that Henry Thompson married the appellant's mother when the appellant was less than three years of age; lived with and supported her in the home until she was grown and married, and never did know that she went by the name of Cook. Of course, it could be that Mr. Thompson had become senile and forgetful following his stroke, as such action would indicate, but the chancellor was in a much better position to evaluate the situation on this point from the testimony he heard, than we are from the record. If Mr. Thompson did recognize the appellant as his daughter and was not reluctant to do so, he was at least very discreet in doing so, for according to appellant's testimony he refused to even have the affidavit prepared in Arkansas for fear someone would find out before his death. I would be more impressed with the affidavit if it had simply said: "I hereby state on oath that I am the father of Lucille Mae Tuttle."

It seems incredible to me that Mr. Thompson would register surprise after a period of more than 40 years that his child's birth certificate gave her the same name as her mother with the father's name not indicated.

Mrs. Koprek testified that soon after the appellant was born and before he married the appellant's mother, he picked up the appellant and said: "Look at our baby." If Mrs. Koprek is correct in her testimony, and appellant is correct also, Mr. Thompson underwent a tremendous change in attitude between the time he said "look at our baby," and the time he refused to have an affidavit prepared in Washington County, Arkansas, acknowledging that he was the father of that baby.

The most I can gather from the testimony relative to the statements made by the appellant's mother, is that she was at least in doubt as to the identity of the appellant's father; whether it was Henry Clay Thompson, Bill Bohannon or Ben Cook. In any event, the appellant

was satisfied with the name Cook, did not question the name Gibbs on her birth certificate and apparently never even suspected that Thompson was her father until she was more than 40 years of age and Henry Thompson had suffered a stroke. She made no claim as an heir to the real property of Henry Thompson, until after the extinguishment by death of a life tenancy reserved in a deed from John Thompson as the sole surviving heir of Henry Clay Thompson.

Many men might probably say they are the father of a certain child when actually they are not, and many men might probably deny that they are the father of a certain child when actually they are, but as to *proof of actual paternity,* I would think the mother would perhaps be better informed than the putative father.

I would affirm the decree.

FOGLEMAN, J., joins in this dissent.